IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| IN RE: | ) |
| | ) |
| JOHN FRANK McLANEY and | ) |
| ROBIN P. McLANEY, | ) |
| | ) |
|     Debtors. | ) |
| | ) |
| JOHN FRANK McLANEY and | ) |
| ROBIN P. McLANEY, | ) |
| | ) |
|     Appellees, | ) |
| | ) |
| v. | )    Case No. 1:04-cv-1128-WKW (WO) |
| | ) |
| KENTUCKY HIGHER EDUCATION | ) |
| ASSISTANCE AUTHORITY, | ) |
| | ) |
|     Appellant. | ) |

## MEMORANDUM OPINION AND ORDER

Kentucky Higher Education Assistance Authority ("KHEAA") appeals the bankruptcy court's determination that John Frank and Robin P. McLaney's (collectively "McLaneys") student loan debts are dischargeable pursuant to 11 U.S.C. § 523(a)(8). *See In re McLaney*, 314 B.R. 228 (Bankr. M.D. Ala. 2004). After carefully reviewing the submissions of the parties, this court finds, for the reasons set forth below, that the bankruptcy court's order is due to be affirmed, although on slightly different grounds.

### I. PROCEDURAL HISTORY

The McLaneys first filed for Chapter 7 bankruptcy on February 4, 2003. *Id.* at 231 n.1. On May 28, 2003, the bankruptcy court entered an order discharging the McLaneys and the case was closed shortly thereafter. (Appellant's Br. at 6.) Subsequently and upon motion by the McLaneys,

the bankruptcy court reopened the case in order for the McLaneys to file an adversary proceeding against KHEAA on October 21, 2003, seeking the discharge of their student loans. *McLaney*, 314 B.R. at 231.  The bankruptcy court conducted a trial and then issued an opinion on September 10, 2004, in which it held that the McLaneys could not repay their student loans without undue hardship and declared the debts to be dischargeable. *Id.* at 238.  On October 11, 2004, KHEAA filed a notice of appeal which this court will now consider.

## II.  FACTS

Robin P. McLaney obtained a bachelor's degree in English from Troy State University at Dothan in 1996.  Three years later, her husband, John Frank McLaney,  received a bachelor's degree in computer information systems from the same institution.  The costs of their education were funded through student loans made by KHEAA for a combined total of $26,647.35.[1]  The loans provide for a repayment term of between five and ten years.  At the time of trial, a monthly repayment of $509.04 was required to pay off the combined balance of the loans assuming a ten year term.  The McLaneys had the option to repay the loans under a Federal Direct Loan Consolidation program that could refinance the loans and extend payments under a new ten or twenty year term.  The ten year term payments would be $272.97 per month and the twenty year term payments would be $165.01 per month.  The McLaneys declined to participate in this repayment program, however.

Mr. McLaney worked for the Phillips-Van Heusen Corporation as a Clerk II earning about $6.80 per hour while he attended college.  Subsequent to his graduation, he took a job with Five Star Federal Credit Union as a network administrator earning about $10.13 per hour.  He resigned in January 2001 and was rehired the next month by Phillips-Van Heusen as a print shop technician

---

[1]  Mr. McLaney owes $15,360.77, and Ms. McLaney owes $11,286.58.

2

earning about $9.47 per hour.  At the time of trial, Ms. McLaney was employed by Harvest Free Will Baptist Church School teaching English with a weekly income of about $200.00 per week.  She also works about eight hours each week for Phillips-Van Heusen.  Neither of her two jobs offers any additional employee benefits.

The McLaneys' net income is $2,253.19 per month, and they claimed the following as monthly expenses, which the bankruptcy court allowed, for a grand total of $2,111.00:

| | |
|---|---|
| Water | $38.00 |
| Home Mortgage | $348.00 |
| Electric Utilities | $100.00 |
| Auto Insurance | $60.00 |
| Telephone | $50.00 |
| Life Insurance | $60.00 |
| Cellular telephone | $50.00 |
| Cable television | $65.00 |
| Auto payment | $120.00 |
| Religious tithe | $220.00 |
| Gasoline | $100.00 |
| Food | $350.00 |
| Medical | $350.00 |
| Other (includes unexpected contingency allowances for home and auto maintenance and repair) | $200.00 |
| **Total** | **$2,111.00** |

Thus, if all their expenses are allowed, their disposable income is $142.19 per month as calculated by the bankruptcy court.

3

Both the McLaneys have health problems.  Mr. McLaney suffers from Addison's disease, hypertension, high cholesterol, nerve damage, and type I diabetes.  He must wear an insulin pump to regulate his blood sugar level due to his diabetes.  He usually visits his physician at least once every three months.  Ms. McLaney has fibromyalgia for which she takes prescription medication and remains under the care of a physician.  The family has medical insurance coverage through Mr. McLaney's employer which pays 80% of their medical expenses exclusive of prescription drugs.  Like most insureds, the McLaneys have to pay a per prescription deductible for their medications.

At the time of trial, the McLaneys had one dependant child who was fifteen years old.  Their house has little, if any, equity and the note secured by their home has a remaining term of about twenty-two years.  They have two high-mileage vehicles: a 1998 Mazda with 225,000 miles and a 1996 Nissan with 135,000 miles.  At the time of trial, the Mazda had been paid for and the Nissan was scheduled to be fully paid for in about a year.  Tithing is not a requirement for continued membership in their church, but the McLaneys have a strong history of doing so.  Their charitable contributions were $4,792 in 2000 (20% of adjusted gross income ("AGI")), $3,870 in 2001 (14% of AGI), $5,118 in 2002 (15% of AGI), and $3,895 in 2003 (13% of AGI).

### III.  JURISDICTION

Jurisdiction is exercised over this bankruptcy appeal pursuant to 28 U.S.C. § 158(a), which provides that "[t]he district courts of the United States shall have jurisdiction to hear appeals (1) from final judgments, orders, and decrees . . . of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under section 157 of this title."  Furthermore, an appeal taken pursuant to 28 U.S.C. § 158(a) "shall be taken only to the district court for the judicial district in which the bankruptcy judge is serving."  *Id.*

## IV.  STANDARD OF REVIEW

"Factual findings by the bankruptcy court are reviewed under the limited and deferential clearly erroneous standard." *In re Club Assocs.*, 951 F.2d 1223, 1228 (11th Cir. 1992).  "In contrast to the deference given to factual findings, [the district] court examines the bankruptcy court's legal conclusions de novo." *In re Terry Mfg. Co.*, 332 B.R. 630, 632 (M.D. Ala. 2005) (citing *Club Assocs.*, 951 F.2d at 1228-29).  The district court must "independently examine the law and draw its own conclusions after applying the law to the facts" and then "may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings." *In re Norris*, 239 B.R. 247, 249 (M.D. Ala. 1999) (quoting *In re Prestwood*, 185 B.R. 358, 360 (M.D. Ala. 1995) and Fed. R. Bankr. P. 8013 (internal quotation marks omitted)).

## V.  DISCUSSION

### A.   *Introduction*

Bankrupt debtors are not normally allowed to discharge their student loans.  *In re Mosley*, __ F.3d __, No. 06-10349, 2007 WL 2263097, at *3 (11th Cir. Aug. 9, 2007).  A narrow exception is made when failing to discharge the student loans would "impose an undue hardship on the debtor and the debtor's dependents."  11 U.S.C. § 523(a)(8) (Supp. 2007).[2]  Section 523(a)(8) was enacted

---

[2]  The statute governing the discharge of student loans has been modified by Congress since this action commenced, but the amendments are not retroactive, and, regardless, the changes are not such that they would affect the outcome of this case.  *See* 11 U.S.C. § 523(a)(8) cmt. (2007 Supp.) (noting the amendments are only applicable to cases commenced on or after April 20, 2005).  The change only broadened the type of loans for which discharge is available. Formerly, the statute read as follows:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—
>     . . .
>      (8) for an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, or for an obligation to repay funds received as an educational benefit, scholarship or stipend, unless excepting such debt from discharge

by Congress amid reports that students were abusing the fresh start policy of the bankruptcy code by filing for bankruptcy and then seeking discharge of their student loans after graduation.  *In re McLeroy*, 250 B.R. 872, 878 (N.D. Tex. 2000).  Subsection 8 was added "in order to protect the United States Treasury, as well as to protect the solvency of the guaranteed student loan program." *Id.*; *see also In re Pelkowski*, 990 F.2d 737, 743 (3d Cir. 1993) ("[T]he debate in the main focused on the twin goals of rescuing the student loan program from fiscal doom and preventing abuse of the bankruptcy process by undeserving debtors.").  Section 523(a)(8) makes student loans presumptively nondischargeable and, as such, mere hardship is insufficient. As one court explained, "It seems universally accepted . . . that 'undue hardship' contemplates unique and extraordinary circumstances. Mere financial adversity is insufficient, for that is the basis of all petitions in bankruptcy." *In re Fulbright*, 319 B.R. 650, 655 (Bankr. D. Mont. 2005) (quoting *In re Brown*, 18 B.R. 219, 222 (Bankr. D. Kan. 1982)).  Indeed, amendments to § 523(a)(8) over the years since its initial passage have increasingly limited debtors' ability to discharge student loans and make it "clear that Congress

---

under this paragraph will impose an undue hardship on the debtor and the debtor's dependents . . . .

11 U.S.C. § 523(a)(8) (2000).  The current statute still contains the same "undue hardship" standard and now reads:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—
>     . . .
>     (8) unless excepting such debt from discharge under this paragraph would impose an undue hardship on the debtor and the debtor's dependents, for—
>             (A)(i) an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution; or
>             (ii) an obligation to repay funds received as an educational benefit, scholarship, or stipend; or
>         (B) any other educational loan that is a qualified education loan, as defined in section 221(d)(1) of the Internal Revenue Code of 1986, incurred by a debtor who is an individual . . . .

11 U.S.C. § 523(a)(8) (2007 Supp.).

intended to make it difficult for debtors to obtain a discharge of their student loan indebtedness."
*In re Cox*, 338 F.3d 1238, 1243 (11th Cir. 2003); *see also Brunner v. N.Y. State Higher Educ. Servs.
Corp.*, 831 F.2d 395, 396 (2d Cir. 1987) (noting "clear congressional intent . . . to make the
discharge of student loans more difficult than that of other nonexcepted debt").

The term "undue hardship" is not defined by the Bankruptcy Code, so the Eleventh Circuit,
among many others, has adopted the three-part *Brunner* test. *Cox*, 338 F.3d at 1240. Under this test,
in order to establish undue hardship, a debtor must prove by a preponderance of the evidence:

> (1) that the debtor cannot maintain, based on current income and expenses, a
> "minimal" standard of living for herself and her dependents if forced to repay the
> loans; (2) that additional circumstances exist indicating that this state of affairs is
> likely to persist for a significant portion of the repayment period of the student loans;
> and (3) that the debtor has made good faith efforts to repay the loans.

*Id.* at 1241 (quoting *Brunner*, 831 F.2d at 396).

KHEAA seeks reversal of the bankruptcy court's decision to discharge the McLaneys'
student loans and makes two primary arguments on appeal: (1) that the bankruptcy court erred in its
application of the *Brunner* test, and (2) that tithing is not an allowable expense under a § 523(a)(8)
undue hardship analysis. (*See* Appellant's Br. at 5.)

**B.     *Application of the Brunner Test Under § 523(a)(8)***

**1.     <u>First Prong - Minimal Standard of Living</u>**

A "minimal standard of living" is not such that debtors must live a life of abject poverty, but
it does require "more than a showing of tight finances." *In re Faish*, 72 F.3d 298, 306 (3d Cir.
1995). As the bankruptcy court correctly noted, "a minimal standard of living lies somewhere
between poverty and mere difficulty." *McLaney*, 314 B.R. at 234. Courts conduct this analysis by
comparing a debtor's disposable income, determined as the difference between his monthly income

and his reasonable and necessary monthly expenses, with the monthly payment necessary to repay the student loans. *See In re Douglas*, 366 B.R. 241 (Bankr. M.D. Ga. 2007); *In re Ivory*, 269 B.R. 890 (Bankr. N.D. Ala. 2001). A court making this determination:

> must apply its common sense knowledge gained from ordinary observations in daily life and general experience to determine whether [a debtor's] expenses are reasonable and necessary. If [the debtor] expends funds for items not necessary for the maintenance of a minimal standard of living or if [the debtor] expends too much for an item that is needed to maintain that minimal standard, then it is unlikely that, given [the debtor's] present circumstance, the first prong of the *Brunner* test is satisfied where such overpayment would permit [the debtor] to cover the expense of her student loan debt without sacrificing a minimal standard of living . . . .

*Douglas*, 366 B.R. at 253-54 (footnote omitted).

KHEAA challenges five expenses of the McLaneys used in determining their disposable income — telephone ($50), cell phones ($50), cable ($65), religious tithe ($220), and "other" ($200) — yet it does "not advocat[e] that any one specific expense or all of these expenses in total are to be eliminated." (Appellant's Br. at 16.)

The court does not find clearly erroneous the bankruptcy court's finding that the budgeted expenses for cable television and cell phone service are reasonable under the circumstances. *McLaney*, 314 B.R. at 234-35. Even under the minimal standard of living test, "[p]eople must have the ability to pay for some small diversion or source of recreation, even if it is just watching television or keeping a pet." *Ivory*, 269 B.R. at 899. In light of the McLaneys' omission of an expense for recreation, it is reasonable to allow a modest cable bill. Furthermore, it is common for courts to allow such expenses. *See, e.g.*, *Douglas*, 366 B.R. at 255 (finding $48 cable and internet bill to be "extremely" reasonable); *In re Johnson*, 299 B.R. 676, 680 (Bankr. M.D. Ga. 2003) (allowing $40 cable bill). The McLaneys' $65 cable bill is a reasonable and allowable expense.

Cell phones may also be considered reasonably necessary, especially for working parents to maintain contact with their children or for a mother who must work part-time in the evenings. *See, e.g.*, *In re Kelly*, 312 B.R. 200, 207 (B.A.P. 1st Cir. 2004) (allowing cell phone expense so debtor could keep in contact with her children); *In re Jackson*, No. 06-1433, 2007 WL 2295585, at *3, *5 (Bankr. S.D.N.Y. Aug. 9, 2007)  (allowing a $150 cell phone bill); *Educ. Credit Mgmt. Corp. v. Durrani*, 320 B.R. 357, 360 (N.D. Ill. 2005) (affirming bankruptcy court's allowance of a cell phone expense in part due to safety reasons); *In re Ratzsch*, 325 B.R. 812, 814 (Bankr. N.D. Iowa 2005) (allowing a $79 cell phone expense for debtor in case of medical emergency).  The McLaneys' cell phone bill covers two phones for the mere cost of $25 per phone.  Considering the need to remain in contact with their child, and health and safety issues, this modest amount for cell phone service is reasonable under the circumstances.

The bankruptcy court did not take up the issue of whether the McLaneys' home phone and "other" expenses were reasonable.  Nevertheless, it goes without saying that maintaining a telephone line is a necessary expense and serves many important functions, the least of which are providing a way to contact doctors, calling in sick to work, or contacting emergency services.  The $50 phone bill cannot be said to be unreasonable. *See, e.g.*, *Johnson*, 299 B.R. at 680 (allowing a $100 phone bill); *Ivory*, 269 B.R. at 897, 900 (allowing a $75 phone bill).  The "other" expense is intended to cover "unexpected contingency allowances for home and auto maintenance and repair." *See McLaney*, 314 B.R. at 232.  Considering the age of the McLaneys' cars and their health problems, and applying common sense, it would be unreasonable not to account for "those other 'unanticipated' expenses which seem, for every family, to inevitably pop-up each month but defy neat categorization." *Ivory*, 269 B.R. at 900.  Furthermore, as a court examines a debtor's expense

9

budget as a whole,  it is appropriate for a court to take into account reasonably necessary items that are omitted, thereby creating, in the words of the bankruptcy court, "an austere and even understated expense budget." *McLaney*, 314 B.R. at 234; *see Douglas*, 366 B.R. at 254 (noting "[t]here are items that this Court considers necessary for a minimal standard of living that Debtor's budget does not make provision for"); *Ivory*, 269 B.R. at 900 (noting the debtor's budget did not include many items that appear on the budgets submitted by most bankruptcy debtors); *In re Rose*, 215 B.R. 755, 764 (Bankr. W.D. Mo. 1997) ("Any apparent overage in one category is offset by other categories which seem too small or are missing altogether."); *In re Kearney*, 162 B.R. 335, 338 (Bankr. D. Kan. 1993) (noting the debtor's expenses were "minimal at best" where his budget did "not include any expenses for laundry or cleaning items, recreation, newspapers, charitable contributions, personal or real property taxes, home or vehicle maintenance, medical or dental expenses not covered by insurance, or attorney's fees").

As the bankruptcy court pointed out, the McLaneys did not include budgeted expenses for clothing, laundry and dry cleaning, or recreation. *McLaney*, 314 B.R. at 234.  They also have a low mortgage payment of $348 and their food budget is an almost impossible $1.30 per meal.  *Id.*  Nor did they include expenses for other items, such as personal or real property taxes, medical or dental expenses not covered by insurance, or attorney's fees.  Considering the meager budget and the persuasive precedence for allowing them, the bankruptcy court's finding that the McLaneys' expenses for telephone, cell phones, cable, and "other" are reasonable under the circumstances is not clearly erroneous.  The tithing expense will be taken up in sub-part V.C.

### 2.    Second Prong - Persistent Circumstances

The second prong of the *Brunner* test requires that additional circumstances exist indicating

that the debtor's minimal standard of living is likely to persist for a significant portion of the repayment period of the loans. *Cox*, 338 F.3d at 1241. KHEAA primarily argues (1) that the McLaneys do not suffer from the type of "additional circumstances" required under the second prong and (2) that they are scheduled to receive salary increases that would end their persistent minimal standard of living. (Appellant's Br. at 15-16.)

Under the second prong of the *Brunner* test, "the inability to pay must be 'likely to continue for a significant time,' such that there is a 'certainty of hopelessness' that the debtor will be able to repay the loans within the repayment period." *Mosley*, 2007 WL 2263097, at *5 (internal citations omitted). "The debtor is not required to prove that her financial situation will persist due only to a serious illness, psychological problem, disability, or other exceptional circumstance; other types of circumstances could apply as well." *Douglas*, 366 B.R. at 256. Other factors to be considered are "the debtor's age, age of the debtor's dependants, debtor's education, work and income history, physical and mental health, and other relevant circumstances." *Id.*

KHEAA is correct in that neither of the McLaneys are so disabled that they are prevented from working. The debtor in *Mosley* suffered from depression and chronic back pain such that it frustrated his efforts to work, which led the court to deem his inability to repay his loans persistent. *Mosley*, 2007 WL 2263097, at *5. Mr. McLaney is unquestionably in poor health and suffers from Addison's disease, hypertension, high cholesteral, nerve damage, and type I diabetes. *McLaney*, 314 B.R. at 231. Due to his diabetes, he is required to wear an insulin pump to regulate his blood sugar level. *Id.* Ms. McLaney suffers from fibromyalgia. *Id.* Despite these health issues, both McLaneys work full time and Ms. McLaney even has a second job. *Id.* Therefore, even under these best of circumstances (full employment unimpeded by disability), the McLaneys can barely afford a minimal

11

standard of living even without having to repay the student loans. The shadow of poor health looming over this family cannot possibly point to improving their chances of increasing their earning potential. Their high mileage vehicles will likely either need to be replaced or repaired in the near future. Expected increases in salary (*i.e.*, $0.37 per hour) are meager and will probably be offset by cost of living increases. In short, the McLaneys are currently in a minimal standard of living and additional circumstances indicate their expenses will only increase overall in the long term. It appears their minimal standard of living will persist over a significant portion of the loan repayment period. The finding of the bankruptcy court was therefore not clearly erroneous.

### 3.      Third Prong - Good Faith Attempt to Repay

The third prong of the *Brunner* test requires for the debtor to have made good faith efforts to repay the loans. *Cox*, 338 F.3d at 1241. KHEAA primarily argues the McLaneys failed to meet their burden of showing good faith because they have only made a few payments toward their loans, failed to minimize their expenses, and failed to take advantage of various repayment options available with lower monthly payments. (Appellant's Br. at 22-23.)

A debtor's "'failure to make a payment, standing alone, does not establish a lack of good faith.'" *Mosley*, 2007 WL 2263097, at *5 (quoting *Educ. Credit Mgmt. Corp. v. Polleys*, 356 F.3d 1302, 1311 (10th Cir. 2004)). "Good faith is measured by the debtor's efforts to obtain employment, maximize income, and minimize expenses; his default should result, not from his choices, but from factors beyond his reasonable control." *Id.* "A lack of bad faith is not the applicable test," and "[a]ctual payments are not required to prove good faith." *Douglas*, 366 B.R. at 259.

At trial and in its appellate brief, KHEAA never contends the McLaneys have made insufficient efforts to obtain employment or maximize income. *See McLaney*, 314 B.R. at 234

("KHEAA does not contend that the debtors are underemployed or that they are in any other way failing to maximize their income."). As for minimizing expenses, KHEAA merely argues that the McLaneys have expenses that should be reduced or eliminated. (Appellant's Br. at 22.) As stated above, the McLaneys' expense budget is lean, even austere, and the listed items are reasonable. Therefore, the McLaneys have sufficiently minimized their expenses.

Even though actual payments are not required to prove good faith, *Douglas*, 366 B.R. at 259, the McLaneys testified that they did make some payments on their loans over the years when they were able to afford it. *McLaney*, 314 B.R. at 232. Obviously, requiring debtors to make actual payments to prove good faith would preclude relief to the very debtors Congress sought to protect under § 523(a)(8)—debtors who are financially unable to repay their student loans without undue hardship. Records indicate that the McLaneys' income and expenses have not changed significantly over the life of their student loans. The bankruptcy court did not clearly err in finding the McLaneys "had no greater ability in the past to repay these loans than they have currently." *Id.* at 238.

KHEAA further argues that the McLaneys have not met the good faith requirement because they did not enroll in a loan consolidation program that would refinance their student loan debt and extend the term of the loan, thereby reducing monthly payments from $509.04 to $272.97 or $165.01, depending on the length of the term. (Appellant's Br. at 11.) KHEAA cites *In re Thoms*, 257 B.R. 144 (Bankr. S.D.N.Y. 2001), as support for the proposition that a debtor who does not attempt to participate in a refinancing program cannot establish good faith.

The Eleventh Circuit recently spoke to this issue and joined other courts in "reject[ing] a per se rule that a debtor cannot show good faith where he or she has not enrolled in the Income Contingent Repayment Program." *Mosley*, 2007 WL 2263097, at *6. Even extremely low

repayment amounts through the use of such programs do not necessarily require a debtor to enroll in order to establish good faith.  *See In re Durrani*, 311 B.R. 496, 506 (Bankr. N.D. Ill. 2004) (reporting "[t]here are numerous published cases where a debtor's monthly payment under the ICRP would be $0.00—obviously an amount that any debtor can pay while maintaining a minimal standard of living—yet the court found the existence of undue hardship and determined that the student loan was dischargeable" and listing cases); *see also Douglas*, 366 B.R. at 261 (finding good faith even though adjusted monthly payments would have been between $0.00 and $9.00); *Johnson*, 299 B.R. at 679, 682 (finding good faith even though adjusted monthly payments would have been between $0.00 and $15.55).

Compared to the McLaneys, the *Thoms* debtor enjoyed a vastly greater disposable income even after allowing for her own higher estimates of expenses.  *Compare Thoms*, 257 B.R. at 149 ($550 per month disposable income that would likely soon rise to $775 per month), *with McLaney*, 314 B.R. at 232 ($142.19 disposable income).  Considering the relatively low standard taken by other courts in the Eleventh Circuit concerning alternative repayment schemes, it is doubtful that, even if the McLaneys' disposable income were sufficient enough to cover payments under a refinanced scheme, their lack of participation correspondingly indicates a lack of good faith.  Therefore, it is easy to conclude that declining to participate in a refinancing program when disposable income is insufficient to cover even the reduced payments is not indicative of bad faith.

## C.    *Tithing and § 523(a)(8)*

KHEAA's second primary argument on appeal is that because tithing is not an allowable expense under a § 523(a)(8) undue hardship analysis, the McLaneys have sufficient funds to repay their loans.  (*See* Appellant's Br. at 24.)

**1.      Impact of the RLCDPA**

KHEAA's argument hinges on the impact, if any, that the Religious Liberty and Charitable

Donation Protection Act of 1998, Pub. L. No. 105-183, 112 Stat. 517, 519 ("RLCDPA"), has upon

student loan dischargeability under § 523(a)(8).

> [The RLCDPA] amended several sections of the Bankruptcy Code to exclude
> charitable contributions of up to fifteen percent of the debtor's adjusted gross income
> from consideration by the bankruptcy courts for various purposes.  For example,
> Congress amended Section 707(b) to make clear that the bankruptcy court should not
> consider a debtor's modest charitable contributions in determining whether to
> dismiss a Chapter 7 case for "substantial abuse."  11 U.S.C. § 707(b).  Congress also
> amended Sections 544(b) and 548(a) to insulate such charitable gifts from avoidance
> by a trustee as fraudulent conveyances. 11 U.S.C. §§ 544(b)(2), 548(a)(2), 548(d)(2)-
> (4).  Congress also declared that charitable contributions should not be considered
> "disposable income" by the bankruptcy court in determining the amount of required
> payments by a debtor to creditors under a Chapter 13 plan.   11 U.S.C. §
> 1325(b)(2)(A).

*In re Ritchie*, 254 B.R. 913, 920 (Bankr. D. Idaho 2001) (some citations omitted).  It has been

observed that the "ultimate purpose of the RLCDPA was to reduce a bankruptcy trustee's ability to

attempt to recover charitable donations from a church under the fraudulent transfer provisions of the

Bankruptcy Code."  *McLeroy*, 250 B.R. at 881.

Importantly, while carving out *per se* exclusions for charitable contributions and tithing, the

RLCDPA made no amendments to § 523(a)(8).  Courts have interpreted this omission in two

primary ways when conducting an undue hardship analysis under § 523(a)(8): by sometimes

considering tithing as an allowable expense,  or by never allowing tithing as an expense regardless

of the circumstances.  The *McLeroy* court rejected the idea that tithing is automatically protected as

a matter of right by the RLCDPA in a § 523(a)(8) analysis and instead held that it "may be

considered in some circumstances as an appropriate expense."  *McLeroy*, 250 B.R. at 879.

Considering the ultimate purpose of the act  and how the most relevant RLCDPA-amended section only dealt with avoidance powers of bankruptcy trustees, the *McLeroy* court concluded that the RLCDPA has no application to § 523(a)(8).  *Id.* at 877.  In determining which circumstances to allow tithing as an expense, the *McLeroy* court adopted a standard in which tithing is not allowed as an expense when the debtor's church provides services and benefits to the debtor irrespective of whether the debtor tithes.[3]  *Id.* at 879.

The *Ritchie* court adopted a broader *per se* exclusion of tithing as an allowable expense than *McLeroy*.[4]  *See Ritchie*, 254 B.R. at 921.  The court recited the rule of statutory interpretation that "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposefully in the disparate inclusion or exclusion."  *Id.* at 919 (quoting *Bates v. United States*, 522 U.S. 23, 29-30 (1997)).  Under this interpretive rationale, the *Ritchie* court reasoned that because Congress chose not to also amend § 523(a)(8), the negative implication must be that Congress intended to prevent debtors from considering tithing an appropriate expense when calculating disposable income available for student loan repayment.  *See id.* at 919-21.  So, in contrast to *McElroy*, *Ritchie* placed such great weight in Congress's exclusion of an amendment protecting tithing in § 523(a)(8) that it

---

[3]  The standard was originally set forth in *In re Lynn*, 168 B.R. 693, 700 (Bankr. D. Ariz. 1994).

[4]  The *Ritchie* court stated that it was adopting the holding of *McLeroy*.  *Ritchie*, 254 B.R. at 921. However, it appears that the holding is actually broader.  The *McLeroy* court held "that a debtor's tithes may be considered in some circumstances as an appropriate expense for the purpose of determining undue hardship in a § 523(a)(8) adversary action to discharge a student loan."  *McLeroy*, 250 B.R. at 879.  In *Ritchie*, the court did not qualify its holding with possible circumstances in which tithing might be considered appropriate and "construe[d] Section 523(a)(8) to exclude religious and charitable donations as a proper expense item in determining whether a debtor would be unduly burdened by not discharging qualifying student loan debt."  *Ritchie*, 254 B.R. at 921. Support for reading *Ritchie*'s holding as broader also comes from its express rejection of condoning even a *de minimis* tithing exception to the § 523(a)(8) analysis.  *Id.* at 920 n.12.

16

construed the omission to function as an effective *per se* prohibition on ever allowing tithing as an expense.

The bankruptcy court below agreed with *McLeroy*'s rejection of a *per se* exclusion of tithing when determining undue hardship because § 523(a)(8) was not amended. *McLaney*, 314 B.R. at 236. However, its decision to allow the tithing as an expense was not based on the *Lynn* standard used by the *McLeroy* court. The bankruptcy court below decided that rules of statutory construction required disposable income to be computed in the same manner in § 523(a)(8) as the sections amended by RLCDPA. *See id.* at 236-37. The reasoning behind this decision is that a determination of disposable income is a component of all the sections and the court believed all the sections to have similar or consistent purposes. *See id.* at 236-37. In support, the court recited the following rule of statutory interpretation:

> Provisions in one act which are omitted in another on the same subject matter will be applied when the purposes of the two acts are consistent. Prior statutes relating to the same subject matter are compared with the new provision; if it is possible by reasonable construction, both are construed so that the effect is given to every provision in all of them. It is also possible to refer to subsequent enactments and amendments as an aid in arriving at a correct interpretation.

*Id.* at 237 (quoting 2B Norman J. Singer, *Sutherland Statutes and Statutory Construction* § 51:2 (6th ed. 2004)). Under this rationale, the court concluded that "bona fide charitable giving that is **within the parameters of § 548(a)(2)** is an allowable expense in calculating disposable income for purposes of determining undue hardship under 11 U.S.C. § 523(a)(8)." *Id.* (emphasis added).

While agreeing with the ultimate result reached by the bankruptcy court and most of its opinion, for two reasons this court respectfully disagrees with the standard employed in determining under which circumstances tithing is allowed. First, although computing disposable income is a

17

component in the sections amended by the RLCDPA and § 523(a)(8) and all of these statutes are part

of the Bankruptcy Code, the purposes of the sections are significantly different.  Second, the other

sections were specifically amended to allow tithing within specified parameters, whereas § 523(a)(8)

was not.  The court will address each reason in turn.

 As for the varying purposes, the First Circuit provides the best explanation of the important

differences between the Bankruptcy Code sections amended by the RLCDPA and § 523(a)(8):

> In undue hardship analysis, most courts employ the same model as is used to
> determine "disposable income" for Chapter 13 plan confirmation purposes.
> **Although the problems are similar** (ascertaining whether there are sufficient
> resources to fund payments), **the objects (disposable income for plan
> confirmations vs. payment without undue hardship) differ**. Under § 1325, a
> debtor is generally not required to alter reasonable lifestyle choices. The same can be
> said of § 707(b) analysis, which generally focuses on the availability of sufficient
> disposable income to fund a Chapter 13 plan.
>
> **Under § 523(a)(8), the debtor's lifestyle (particularly expenses) is subjected to
> more rigid scrutiny**. Courts differ on the degree of scrutiny applied, or, more
> precisely, on how much hardship a debtor can be expected to bear before it becomes
> "undue." But deference to a debtor's lifestyle choices is, to put it kindly, muted.
> Eliminating some expenses that would be considered legitimate under § 1325 might
> well be done without creating "undue" hardship.

*In re Savage*, 311 B.R. 835, 840 n.7 (B.A.P. 1st Cir. 2004) (citations omitted) (emphasis added).

These differing purposes were part of the reason another court disagreed with the bankruptcy

opinion below.  *See In re Fulbright*, 319 B.R. 650, 660 (Bankr. D. Mont. 2005).  Because the

*Fulbright* court did "not view the subject matter of § 523(a)(8) (discharge of educational loans based

on undue hardship) as the same subject matter or purpose as the subject matter and purposes of §

548(a)(2) (recovery of fraudulent transfers), § 707(b) (dismissal for substantial abuse if Chapter 7),

and § 1325(b) (confirmation of a Chapter 13 plan)," it concluded the purposes were not consistent

and declined to follow the cited rule of statutory interpretation.  *Id.  Fulbright* went on to adopt the

*Ritchie* court's holding that the inclusion of tithing as an expense is *per se* improper when determining whether to discharge student loan debt. *Id.*

The rule of statutory construction applied by the bankruptcy court below states that "[p]rovisions in one act which are omitted in another on the same subject matter will be applied when the **purposes of the two acts are consistent**." *McLaney*, 314 B.R. at 237 (emphasis added). As the *Savage* court explained, the purpose of the bankruptcy sections amended by the RLCDPA are simply too different from § 523(a)(8) to be considered "consistent" with each other. *Savage*, 311 B.R. at 840 n.7. The differing purposes were acknowledged as much in the bankruptcy court's opinion,[5] although it still construed the standard of a section amended by the RLCDPA to extend to § 523(a)(8). Applying the mechanical standard of § 548 to § 523(a)(8) would allow an end-run around the already-reached conclusion that the RLCDPA did not amend § 523(a)(8).

To recap, this court agrees that tithing is not a *per se* allowable expense because the RLCDPA made no changes to § 523(a)(8) and nothing in § 523(a)(8) provides for it. By the same token, a *per se* exclusion of tithing, such as that applied by *Ritchie*,  would also effectively amend § 523(a)(8) when Congress made no such alteration.[6] Just as some courts have argued that the RLCDPA amendments should not extend to § 523(a)(8) due to its differing purpose, that very same differing purpose likely explains why Congress did not feel the need to carve out a tithe protection

---

[5] The court stated that "for **various purposes** bankruptcy courts are required to determine a debtor's disposable income" and then went on to describe how disposable income is determined under §§ 1325(b), 548(d), and 707(b)—all sections of the bankruptcy code that were amended by the RLCDPA to exclude religious contributions from the calculation of disposable income. *See McLaney*, 314 B.R. at 236 (emphasis added).

[6] The bankruptcy court correctly noted that "[t]o conclude otherwise would be tantamount to 'writing in' to the statute an exclusion which the statute does not contain" and "[t]he absence of an amendment insulating charitable contributions in the undue hardship context would be significant only if the statute expressly excluded them." *McLaney*, 314 B.R. at 236 n.11.

under § 523(a)(8).  If the RLCDPA's primary purpose is to protect churches from being sued by bankruptcy trustees attempting to recover tithes previously made by debtors and already received by churches, Congress would have little reason to make changes to § 523(a)(8) when it deals only with whether or not a student loan should be discharged and never allows a retroactive reach back into a church's coffers.  Therefore, the omission of a tithe protection in § 523(a)(8) should not be construed as Congressional intent to always exclude tithes as an expense under the undue hardship analysis but rather that Congress simply paid no mind to § 523(a)(8) when it passed the RLCDPA.  Simply put, the RLCDPA did not amend § 523(a)(8) in any form or fashion.  Therefore, the court will examine undue hardship analyses that were applied before the passage of the RLCDPA.

### 2.    <u>Pre-RLCDPA Analysis</u>

Prior to the passage of the RLCDPA, courts were also split as to whether tithing should be considered as an expense in a § 523(a)(8) undue hardship analysis and, if allowed, when to allow it.  As mentioned above, one line of cases descending from *In re Lynn* allowed tithing but limited it to instances where the debtor's church required tithing as a condition of membership or for the receipt of services.  *See Lynn*, 168 B.R. at 700; *McLeroy*, 250 B.R. at 879.  A great many courts have taken a different view and treated tithing or charitable contributions just as they would any other allowable expense in an undue hardship analysis.  *See In re Rose*, 215 B.R. 755, 764 (Bankr. W.D. Mo. 1997) (listing charitable contributions as a missing allowable expense); *In re Webb*, No. 94-4077, 1995 WL 17005053, at *4 (Bankr. S.D. Ga. Mar. 1, 1995) (considering — although ultimately rejecting as unreasonable — an $80 charitable contribution along with expenses for telephone, clothes, automobile, and recreation/entertainment); *In re Linville*, No. 95-6145, 1995 WL 783218, at *3 (Bankr. N.D. Ohio Dec. 12, 1995) (assuming the validity of allowing debtors' 10% tithe for the

20

purposes of the expense analysis, although questioning whether it was appropriate to do so without proof of its bona fide nature); *In re Wilson*, 177 B.R. 246, 250 (Bankr. E.D. Va. 1994) (suggesting a charitable contribution of $100 could be lower, but considering it along with electricity); *In re Kearney*, 162 B.R. 335, 338 (Bankr. D. Kan. 1993) (implying charitable contributions are acceptable); *In re Johnson*, 121 B.R. 91, 94 (Bankr. N.D. Okla. 1990) (considering $20 tithe along with expenses for clothes, newspapers, books, a long distance phone bill, and a security system). This tradition of allowing bona fide and reasonable tithing as an allowable expense in § 523(a)(8) undue hardship cases has even continued in many courts after the passage of the RLCDPA. *See In re Cline*, 248 B.R. 347, 351 (B.A.P. 8th Cir. 2000) (approving $25 charitable contribution expense and not mentioning RLCDPA); *In re Avant*, No. 06-3015, 2006 WL 3782168, at *3 (Bankr. W.D. Mo. Dec. 21, 2006) (finding $297 in tithes and donations, along with other expenses, to be reasonable and not mentioning the RLCDPA); *Johnson*, 299 B.R. at 678-80 (considering $80 tithe along with all other expenses and not mentioning RLCDPA); *Durrani*, 311 B.R. at 503-04 (allowing a $226 tithe, mentioning the RLCDPA and the split of cases, and concluding "a bankruptcy judge should not override a debtor's commitment to tithing"); *Ivory*, 269 B.R. at 900 (finding debtor's expenses, which included a $100 charitable contribution, to be "reasonable and necessary" and not mentioning RLCDPA); *In re Meling*, 263 B.R. 275, 279 (Bankr. N.D. Iowa 2001) (noting the split of cases, rejecting *Ritchie* and *McLeroy*, and finding $100 tithe to be "reasonable under the circumstances").

This court does not hesitate to conclude that if bankrupt families are allowed to indulge a family pet or watch *The Sopranos* in the comfort of their homes on their cable television, surely a bona fide tithe to their church may at least be considered as a proper expense. Therefore, bona fide

tithing or charitable contributions are to be examined under the same reasonableness standard as other reasonable and necessary expenses under a § 523(a)(8) undue hardship analysis.

### 3. Application of the Reasonableness Standard

Having determined that the RLCDPA has no effect on § 523(a)(8) and that tithing may be an allowable expense, the court now turns to the specific issue of whether the McLaneys' tithe of $220 is an allowable expense.  In determining whether an expense is allowable, courts normally examine the reasonableness in the context of its own category.  For example, the amount spent on cable is not compared to the amount spent on laundry.  Rather, the amount spent on cable is compared to what it reasonably costs to acquire cable.  *See, e.g.*, *Douglas*, 366 B.R. at 255 ("The $48 Debtor expends each month to provide basic cable television and cable modem service to her home is an extremely reasonable price in the Court's experience.").  Therefore, it is inappropriate to compare the amount budgeted for tithing with an amount budgeted for an unrelated expense.

The McLaneys' tithe amounts to less than ten percent of their net income.  This is not an insignificant amount, but it does fall within the range of typical tithing.   The annualized amount of their proposed tithe expense is much less than what they historically have given.[7]  Additionally, considering the McLaneys' budget as a whole and the likely necessary items omitted, the court concludes the amount budgeted for tithing is reasonable under the circumstances.  It would be unfair to penalize debtors who may have sacrificed other areas of their budget (such as $1.30 per meal for food) in order to afford a reasonable tithe.

---

[7]  Their proposed tithe budget of $220 per month equals $2,640 per year.  This is a cut from what they have tithed in years past ($4,792 in 2000, $3,870 in 2001, $5,118 in 2002, and $3,895 in 2003).  *See McLaney*, 314 B.R. at 232.

## VI.  CONCLUSION

Having conducted a de novo review of the bankruptcy court's findings of law and for the reasons set forth above, the bankruptcy court correctly applied the *Brunner* test and also reached the correct result by allowing the inclusion of the debtors' tithe as an expense under the § 523(a)(8) undue hardship analysis.  The decision of the bankruptcy court is due to be AFFIRMED, although on slightly different grounds.[8]  An appropriate judgment will be entered.

DONE this 19th day of September, 2007.

/s/  W.  Keith Watkins
UNITED STATES DISTRICT JUDGE

[8]  The two standards (reasonableness and § 548(a)(2)'s defined parameters) inevitably will often overlap thereby resulting in the same outcome in many instances.  Important differences remain, however.  Applying the § 548(a)(2) standard totally removes tithing expenses from consideration and gives the tithe a complete shield as long as it meets the statutorily defined parameters, no matter what the debtor's other expenses may be.  The reasonableness standard is by its nature a more flexible standard and allows a tithing expense to be considered in the context of all the debtor's other expenses (or, importantly, a lack thereof).